JAMES REILLY DOLAN
Acting General Counsel

BRIAN N. LASKY
NY Bar No. 3993417; blasky@ftc.gov
CHRISTOPHER Y. MILLER
NY Bar No. 3983160; cmiller@ftc.gov
FEDERAL TRADE COMMISSION
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829
(212) 607-2822 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**, <br><br> Plaintiff, <br><br> v. <br><br> **SEED CONSULTING, LLC**, also doing business as SEED CAPITAL and FOUNDATION FUNDING, a Nevada limited liability company, <br><br> **CREDIT NAVIGATOR, LLC**, a Nevada limited liability company, <br><br> **ERIK GANTZ**, individually, and as a principal and owner of SEED CONSULTING, LLC and CREDIT NAVIGATOR, LLC, and | Case No. 2:21-cv-154 <br><br> **COMPLAINT FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT** |

**RANDY LANG**, individually,

Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h, and Section 2(d) of the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Trade Regulation Rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, Section 404 of CROA, 15 U.S.C. § 1679b, and Section 2(c) of CRFA, 15 U.S.C. § 45b.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1345.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (c)(1), and (c)(2), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

4. Since at least 2013, Defendants Seed Consulting, LLC, Credit Navigator, LLC, Erik Gantz, and Randy Lang (collectively, "Defendants") have charged consumers to obtain so-called "funding" to pay for costly trainings offered by a number of third-party companies with whom Defendants partner. These include a number of companies sued by the FTC and other law enforcement agencies for orchestrating major deceptive schemes (the "Training Companies").

The Training Companies sell seminar and coaching packages costing tens of thousands of dollars that purport to teach consumers how to make money by investing in real estate or operating an online business.  Defendants' "funding" operation relies on customer referrals from the Training Companies, and the funding they provide is often pitched to consumers as a way for them to obtain capital to grow their nascent businesses or to invest in real estate or securities.

5.     Defendants are not in fact lenders and do not provide any form of financing themselves.  Instead, Defendants charge consumers a fee of $3,000 or more to submit numerous applications for personal credit cards on behalf of their customers, a process known as "credit card stacking."  Defendants generally try to obtain at least $50,000 in total credit lines with introductory zero-percent interest rates for each of their customers across a half dozen or more credit cards.

6.     In order to maximize the amount of credit they obtain for consumers, Defendants include income figures in the credit card applications they submit on behalf of their customers that are substantially overstated.  They justify this practice on the pretext that the figures purportedly reflect the additional income their customers can anticipate earning in the coming year by utilizing the training provided by the Training Companies.  Defendants take other steps to manipulate the underwriting processes of the credit card providers, such as using credit locks to artificially reduce the number of credit inquiries.  Defendants' practices result in consumers obtaining numerous credit cards and significantly more credit than the banks would otherwise provide.

7.     After Defendants obtain numerous credit cards for customers, they routinely tell the Training Companies that the consumers now have funds available to them, often without the consumers' knowledge that the Training Companies are being so informed.  This allows the Training Companies to pitch additional costly products or services to the consumers.

8.      In the end, most of Defendants' customers do not earn substantial money through the Training Companies' programs and, as a result, they are unable within a reasonable timeframe to pay off the balances from the cost of the trainings on the credit cards obtained by Defendants.  Many of Defendants' customers end up mired in debt with their credit scores in ruins.  Defendants, on the other hand, have profited considerably from this scheme, having taken in millions of dollars from consumers across the country.

## **PLAINTIFF**

9.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 4158.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act.  Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.  The FTC also enforces CROA, 15 U.S.C. §§ 16791679j, which prohibits, *inter alia*, making any statement, or advising any consumer to make any statement, that is untrue or misleading in connection with an application for the extension of credit. The FTC also enforces the CRFA, 15 U.S.C. § 45b, which prohibits, *inter alia*, the offering of provisions in form contracts that restrict individual consumers' ability to communicate reviews, performance assessments, and similar analyses about a seller's products, services, or conduct.

10.     The FTC is authorized to initiate federal district court proceedings by its own attorneys, to enjoin violations of the FTC Act, the Telemarketing Act, CROA, and the CRFA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 57b, and 1679h(b).

**DEFENDANTS**

11.    Defendant **Seed Consulting, LLC** ("Seed"), also doing business as Seed Capital and Foundation Funding, is a Nevada limited liability company with its principal place of business at 1707 Village Center Circle, Suite 200, Las Vegas, NV 89134.  Seed transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Seed has advertised, marketed, or sold its credit card funding service to consumers throughout the United States.  In addition, at times material to this Complaint, Seed has been the 25% owner of WCAP Business Services, LLC, also doing business as WCAP Financial ("WCAP"), which has engaged in marketing and lead generation services for Seed.

12.    Defendant **Credit Navigator, LLC** ("Credit Navigator") is a Nevada limited liability company with its principal place of business at 1707 Village Center Circle, Suite 200, Las Vegas, NV 89134.  Credit Navigator transacts or has transacted business in this District and throughout the United States.  At all times material to this Complaint, acting alone or in concert with others, Credit Navigator has advertised, marketed, or sold its service for obtaining consumers' credit reports and credit monitoring to consumers throughout the United States.

13.    Seed and Credit Navigator are collectively referred to herein as the "Corporate Defendants."

14.    Defendant **Erik Gantz** ("Gantz") is the principal owner of the Corporate Defendants and the managing partner of Seed.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Defendant Gantz resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.     Defendant **Randy Lang** ("Lang") is a Utah resident.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  In addition, at times material to this Complaint, Lang has been the 75% owner of WCAP.  Defendant Lang, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

16.     The Corporate Defendants are closely held companies that have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  The Corporate Defendants have conducted the business practices described below through interrelated companies that have common ownership, officers, managers, business functions, employees, and office locations.  Also, the Corporate Defendants commingle funds and rely on a shared method to identify potential customers.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Furthermore, Gantz and Lang (collectively, the "Individual Defendants") have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

17.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### A.   Seed's Business Practices and Referral Relationships

18.     Seed was formed in 2009 in the State of Nevada by defendant Gantz and another individual.  Gantz is now the sole owner of Seed.

19.     Defendants market Seed's services as obtaining purported "funding" or "financing" for consumers to start or grow a business.

20.     Seed's "funding" comes about through a process known as credit card stacking, whereby Seed prepares and submits applications for numerous personal credit cards that typically come with introductory zero-percent interest rates.  The credit cards are offered by third-party financial institutions that are unaffiliated with Seed and with whom Seed does not have a business relationship.  In its customer contracts, Seed guarantees that it will obtain a specified amount of funding for consumers, often $50,000.  By stacking together the various credit lines on the credit cards it obtains for its customers, Seed purports to satisfy this guarantee.  Seed charges its customers a fee of between $3,000 and $4,000 for this service and usually collects its fee from one of the new credit cards it obtains for consumers.

21.     In its initial three years, many of Seed's customers were individuals seeking funding to open or grow a new location of a national franchise.  Since at least 2013, however, Seed has largely worked with customers referred to it by companies that sell training programs on how to purportedly make money through a new business or through investments, including the Training Companies.

22.     The Training Companies' programs take a variety of forms, including programs that purport to teach consumers how to generate income by investing in real estate, by selling stocks or options, or through operating an online business, such as on eBay or Amazon.  Referrals from providers of training services now generate a majority of Seed's customer base.  Only a small percentage of Seed's business now comes from its work with franchisees.

23.     The trainings and coaching services offered by the Training Companies are expensive, with prices often in the tens of thousands of dollars. In order to induce consumers to pay these amounts, the Training Companies often represent to consumers that they will earn substantial income as a result of the trainings and coaching services, such as several thousand dollars of additional monthly income. In actuality, however, the great majority of consumers who purchase the trainings and coaching services typically do not earn the promised substantial income or even recoup the money they paid to the Training Companies.

24.     Defendants provided "funding" services in connection with many training and coaching schemes that have been the subject of law enforcement actions, including FTC lawsuits. These enforcement actions have alleged, among other things, that the Training Companies misrepresented that consumers who purchased their trainings and coaching services were likely to earn substantial incomes through online businesses or real estate investments. *See FTC & Utah Div. of Consumer Prot. v. Nudge, LLC*, No. 19-cv-00867-RJS (D. Utah) (complaint filed on Nov. 5, 2019) (real estate training scheme); *FTC & Utah Div. of Consumer Prot. v. Zurixx, LLC*, No. 19-cv-00713-DAK (D. Utah.) (complaint filed on Sept. 30, 2019) (real estate training scheme); *Utah Div. of Consumer Prot. v. Stevens*, Case No. 190907053 (Utah Dist. Ct.) (complaint filed on Sept. 6, 2019) (real estate training scheme doing business as "Real Estate Workshop"); *FTC v. MOBE Ltd.*, No. 18-cv-00862-RBD (M.D. Fla.) (final order against corporate defendants entered on Apr. 13, 2020) (online business training scheme); *FTC v. Digital Altitude LLC*, No. 18-cv-00729-JAK (C.D. Cal.) (final order entered on Mar. 6, 2019) (online business training scheme); *FTC & State of Minn. v. Sellers Playbook, Inc.*, No. 18-cv-02207-DWF (D. Minn.) (final order entered on Nov. 20, 2018) (online business and business opportunity scheme); *FTC v. AWS, LLC*, No. 18-cv-00442-JCM (D. Nev.) (final order entered on Jun. 15, 2018) (online business training scheme doing business as "FBA Stores"); *FTC v. Apply Knowledge, LLC*,

No. 14-cv-00088-DB (D. Utah) (final order entered on February 16, 2016) (online business coaching scheme doing business as "Coaching Department").

25.    During the time period relevant to this Complaint, the two largest sources of customer referrals to Seed were real estate training and coaching schemes Nudge, LLC and its affiliated entities (collectively, "Nudge") and Zurixx, LLC and its affiliated entities (collectively, "Zurixx"), both of which are based in Utah.

26.    Nudge and Zurixx have each referred customers to Seed since at least 2016. Defendant Lang, who has longstanding ties to the business coaching and training industry, has established the referral arrangements between Seed and most of the Training Companies, including Nudge and Zurixx. In addition, Lang, both individually and through his company WCAP, has provided various marketing and lead generation services to Seed. In exchange, Seed has paid WCAP, which is 75% owned by Lang, a share of all of the customer sales WCAP generates. Once the referral arrangements with the Training Companies have been established, Defendant Gantz generally handles the ongoing management of Seed's relationships with these companies. Gantz regularly communicates with the Training Companies and has attended many of their training events, including numerous Nudge seminars.

27.    Between approximately 2010 and 2014, Lang co-owned Daeus Financial ("Daeus") with Zurixx officers Jeffrey Spangler and Cristopher Cannon. Daeus sold various add-on services to consumers referred to it by business coaching and training companies. Since at least 2012, Spangler and Cannon have co-owned Zurixx with a third individual. Through his relationship with Zurixx's owners, Lang established the referral arrangement between Zurixx and Seed. As a result, at times material to this Complaint, Seed paid a $750 commission to WCAP for customers referred to Seed by Zurixx.

28.     Similarly, Lang established the referral arrangement between Nudge and Seed through his relationship with one of Nudge's owners.  As a result, at times material to this Complaint, Seed paid a $1,000 commission to WCAP for customers referred to Seed by Nudge.

29.     Lang has also provided Seed with customer service support with respect to consumers who submitted complaints to the company or to government agencies or who complained online, including on websites maintained by the Better Business Bureau ("BBB").  Lang has often used a "seedcapital.com" email address to communicate with these consumers.  According to Lang, WCAP formally ceased marketing for Seed in March 2019, but Lang continues to assist Seed with both lead generation and support with respect to consumer complaints in his individual capacity.

30.     Gantz often asks Lang to handle the most serious customer complaints concerning Seed or the Training Companies, while a Seed customer service representative covers the others.  Lang or the Seed representative typically speaks to the consumer complainants to identify their concerns and assess whether they intend to pursue their complaints publicly or with government agencies or BBBs. This information is then conveyed to Gantz along with a refund recommendation, with Gantz responsible for approving any refund offers.

31.     Numerous consumer complaints received by Defendants state that consumers are unable to profitably implement the Training Companies' strategies, that the trainings and coaching services themselves are of limited value, that consumers take on substantial debt to pay for the trainings and coaching services, and that their credit scores often plummet as a result of being unable to timely repay these debts.

32.     Defendants routinely coordinate their responses to these complaints with the Training Companies and, in many instances, have attempted to suppress consumer criticisms of their business practices and their relationships with the

Training Companies.  Defendants have frequently tried to convince consumers to withdraw public complaints and reviews, including consumers' online submissions to the BBB.  In addition, Defendants have attempted to prevent consumers from publicizing their experiences or cooperating with government entities by using refund agreements with consumers that contain a "Non-Disparagement" provision. This clause in Defendants' form agreement purports to prevent consumers from making verbal or written statements "that might reasonably be construed to be derogatory or critical of, or negative toward" Defendants.

33.     Consumer complaints received by Defendants about the Training Companies include the following:

- In April 2017, Gantz authorized a refund for a consumer who told a Seed representative that "she quickly became aware that the service" she purchased from FBA Stores, a Training Company that purported to show consumers how to make money by selling on Amazon, "was essentially useless and that there was no way" her new business would generate enough sales to pay off her credit card debt.  The Seed representative described the consumer as "intelligent" and "likely a serious career professional," who also complained that FBA Stores was a "scam" that "use[s] your company [Seed] to[] secure funds so that they can be paid." Lang quickly reported to FBA Stores that this was "a 911" situation involving a consumer who had reached out to "government agencies," adding that Seed was giving a full refund and advising that FBA Stores should do the same.

- In February 2017, Lang and Gantz learned about a complaint by a Nudge consumer who had a "very debilitating" case of multiple sclerosis that prevented him from walking very far and continuing to do his job. Before he enrolled in the training program, the consumer explained to Nudge that he has "many limitations," but Nudge employees assured him that "he could do it and it would all be ok."  Contrary to these promises, the consumer told Seed customer service representatives that he was "unable" to use the Nudge training, that the real estate program "wasn't being very helpful," and that Nudge representatives "weren't hearing me every time I explained my disability issues."  After the consumer learned

that he could not use the credit cards he obtained through Seed to invest in real estate at a Nudge event, the consumer said he would use the internet to "expose" Nudge because "it wasn't fair what they did to us." In his report to Gantz and Lang, a Seed representative commented that, if true, "it appears to me to be a classic Bait & Switch plus a whole bunch o'nother things that ain't good." When Gantz was informed of the complaint, he warned Lang and others, "We need to head this off."

- In December 2017, a Seed customer service representative emailed Gantz and Lang about a consumer who "said that every bit of his Seed [$]78k has been used to pay Response [a Nudge affiliate] for all the various programs they told him he needed." The consumer complained that "he has been working very hard to complete RE [real estate] deals but that basically Response isn't doing anything for him" and added that "he considers their website to be a joke and so he sees no reason to try and use it anymore, with Zillow and Redfin, etc. being a lot more useful." Gantz forwarded this email to a Nudge employee to ensure that the consumer was "on your radar."

- In February 2018, a Nudge representative contacted Gantz about a consumer complaint to a government agency for which Nudge was providing a refund and "recommend[ed]" that Seed do the same. In his complaint, the consumer alleged that "absolutely nothing was learned" at a Nudge training event; instead there were "teases" about "what could be taught" if he purchased another training package. According to the consumer, after he purchased the additional package, he was taught strategies like putting up public signs offering to sell "moldy" homes without actually having any such homes to sell. The consumer alleged that this tactic was both "deceitful" and "100% illegal" in his home state without a real estate license.

- In May 2018, a customer emailed a Seed representative complaining that he had "followed ever[y]thing my MOBE business partners have told me in everyway [sic] . . . but [I] have not made any money," that "I have paid out to the cards almost all my savings" and "[I] have sold ever[y]thing of value [I] own and [I'm] almost financially ruined." The consumer recounted that MOBE, a Training Company that purported to teach consumers how to start an online business, had previously "assur[ed] me there would be plenty of sales and it would be easy to pay back the cards.

12

. . . not so."  Gantz forwarded this email to his contacts at MOBE with a simple "Pls see below."

- In January 2019, Lang authorized a refund for a consumer who had taken training through Sellers Playbook, another Training Company that purported to teach consumers how to make money selling on Amazon. The consumer agreed to withdraw an online BBB complaint that alleged that WCAP, which enrolled many of Seed's customers, "can definitely help get you money, but they leave you with a hot credit card mess that may devastate you, and then refuse to return your calls. . . .  Just don't do it!!!!!  They affiliate with business scammers!!!!!!"

- In February 2019, Gantz agreed to a refund and settlement with a Zurixx customer to "[e]nsure we [Seed] are left out" of future complaints.  In requesting the refund, the consumer had told Seed that "[e]verything [Zurixx] promised us turned out to be a lie" and that "[t]his is not a legit company" while noting that she took out a home equity loan to help pay down over $50,000 in credit card charges that had "destroyed" her credit.

34.    Through consumer complaints such as these, as well as their coordination with the Training Companies to respond to these complaints, Defendants have repeatedly been made aware of the deceptive practices of the Training Companies.  Despite this knowledge, Defendants have continued to work with Training Companies because of the lucrative referrals they generate. Thousands of consumers referred by the Training Companies have become Seed's customers.

35.    For example, between April 2017 and November 2019, consumers referred by Nudge and Zurixx paid Seed more than $10 million in fees.  Gantz and Lang, in turn, received substantial distributions of these revenues through closely held companies that they control.

36.    The arrangement has also been a financial boon to the Training Companies.  Seed's services have resulted in its customers having increased credit available to them, thereby enabling the Training Companies to deceptively sell additional, costly training and coaching programs to consumers.  For example,

Seed obtained more than $230 million in available credit card lines for the 3,840 consumers that were referred to the company by Nudge between February 2016 and May 2018.  Moreover, Seed has paid many of the Training Companies a commission for their referrals, including at least $250,000 paid to Nudge.

**B.     The Marketing of Seed's Credit Card Stacking Services**

37.     Defendants rely extensively upon the Training Companies to market Seed's services.  Many of Seed's customers first learn about the company when it is pitched at seminars held by one of the Training Companies.  Seed has provided training to Training Companies' salespeople on how to promote Seed's services to consumers.

38.     In the case of Nudge and Zurixx, Seed's services are typically first marketed to consumers at "Workshops" by the Training Companies' presenters from the front of the seminar room.  Workshops are the second stage in the companies' seminar sales cycle.  This sales cycle begins with free "Preview Events" that largely serve to market the three-day Workshops, which typically cost at least $1,000.  The Workshops, in turn, market additional, more expensive "Advanced Trainings" that typically cost tens of thousands of dollars.  Given the substantial cost of the Advanced Trainings, Nudge and Zurixx often promote Seed to consumers at the Workshops as a source of additional capital.

39.     Even after consumers purchase one of the Advanced Training packages, some of the Training Companies, including Nudge and Zurixx, attempt to sell additional products and services to their customers, including purported personalized coaching programs ("Coaching Programs") that often cost tens of thousands of dollars more.  The Training Companies use outbound telemarketing to sell the Coaching Programs to consumers.  The funding Seed obtains for consumers is often used by consumers to purchase the Training Companies' Advanced Trainings and Coaching Programs.

14

40.     At the Workshops, the presenters often describe Seed's financing as a tool to provide consumers with capital to use to purchase real estate properties and grow their real estate businesses.  They market Seed this way even though the primary reason the Training Companies partner with Seed is so that consumers have access to credit to pay for their trainings and coaching services.  To lend credibility to Seed, the Training Companies' presenters frequently tout Seed's prior work with individual franchisees, even though most of Seed's business now comes through training providers.

41.     Often, the Training Companies' presenters do not explain that Seed does not itself provide any funding to consumers, but rather only submits numerous credit card applications to third-party financial institutions on behalf of its customers in exchange for a fee.  Many presenters only vaguely indicate that the "funding" comes with a zero-percent interest rate for a period of time.

42.     For example, at a July 19, 2019 Workshop, a Zurixx seminar presenter described Seed (operating under the name "Foundation Funding") as offering "unsecured loans" or "cash lines of credit" for consumers to use to invest in real estate:

> Now, the company -- because we have thousands of successful
> investors doing lots of deals -- has made a special relationship with us.
> You cannot go out and find this on your own. The company spent a
> lot of time and money doing this. The company, called Foundation
> Funding, has done over a billion dollars of entrepreneurial investing
> lending. . . . And they, again, are making a lot of money. The interest
> rate is introductory for a year, zero. They make a lot of money doing
> that.  They've helped franchises and other businesses like 7-Eleven,
> FedEx, Subway, Coldstone, Nike.  These are the top businesses in
> America and they fund us.  Why do they fund us?  Because they know
> our students are better trained doing good deals.  Correct?  And
> they've offered this special opportunity.  So they will help you with
> your real estate business. Right?  They're A-plus rated and it's zero
> percent financing up to $150,000 unsecured. . . . These are unsecured

loans. . . .  Now, you get $10,000 to $100,000 in cash lines of credit at zero interest.

43.     Many of Seed's customers understand from statements like these that Seed would provide them capital directly, either through a loan or line of credit. These consumers do not understand that Seed merely sends out numerous applications for personal credit cards that come with teaser introductory rates and charges a fee of $3,000 or more for this service.

44.     Many consumers would not have purchased Seed's services if they understood that the purported "funding" comes in the form of multiple personal credit cards.  Among other reasons, the post-introductory period interest rates on these credit cards typically are relatively high compared to other forms of credit, often exceeding 15%.  In addition, many consumers purchase the funding with the goal of using the capital to purchase real estate properties.  In order to use a credit card to purchase real estate, consumers usually must take a cash advance on their credit card.  Cash advances often entail substantial fees, as well as higher rates of interest compared to the typical interest rates for consumer credit cards.

45.     Although Seed's employees often do not attend the trainings, Defendants know that the Training Companies routinely promote Seed's services in an inaccurate manner.  On numerous occasions, Defendants have failed to correct the Training Companies' misrepresentations prior to the time consumers decide to purchase Defendants' services.  Defendants have the authority to require that Seed's services be correctly described by the Training Companies, but have failed to do so.

46.     For example, in an internal email from March 2018, a Seed customer service representative wrote to Defendants Gantz and Lang, among others, that "[a]t these [training] events they generally do a pretty slick job of selling their students on how they will be working hand in hand with everyone in their network to make sure all the client's needs will be met, while also going on and on about

how everyone involved (including Seed) are cutting edge experts in this and that and we will all know exactly what they need even before they know they need it and so on blah blah blah."  The representative added that "[a]nd then you add an 84 year-old to the mix and you just pray there won't be any problems."

47.     Seed's own website (www.seedcapital.com) ("Seed Website") is consistent with how the Training Companies' presenters describe the company's funding.  The term "credit cards" does not appear anywhere on the Seed Website; instead, the website only vaguely mentions that Seed has raised over "$1.7 billion" through "cash credit lines":

## OVER $1.7 BILLION RAISED SINCE 2008.

Funding a startup is one of the most difficult challenges any entrepreneur will face. Having personally founded over a dozen startups, the Seed Capital executive team understands just how difficult it is to secure funding and turn an idea into reality.

Seed Capital's mission is to assist entrepreneurs in financing their start-ups through innovative funding and credit building techniques. By providing the cash credit lines needed to launch a business our clients benefit from our team's vast knowledge and experience, and our policies have been created to ensure that the motivations of our clients and our firm are clearly aligned.

### C.     Defendants' Qualification and Enrollment Process

48.     After promoting Seed's services, the Workshop presenters encourage consumers to find out whether they qualify for funding through Seed during a break in the Workshops.  Consumers who qualify are then encouraged to enroll with Seed onsite during the Workshops.  At the same time, many of these consumers also sign up for expensive Advanced Training packages that were pitched by the Training Companies during the Workshops through deceptive claims that they could earn substantial sums of money.  The Advanced Training packages typically range in cost from approximately $20,000 to as much as $45,000.

49.     Presenters at the Workshops instruct consumers to enter their personal information on a website called CreditNav to determine if they qualify for funding through Seed.  CreditNav is owned and operated by Defendant Credit Navigator.

50.     CreditNav pulls credit reports from the three major credit bureaus (Equifax, Experian, and TransUnion) for consumers and determines whether they qualify for Seed's services.  In order to qualify, a consumer typically must have a credit score that is at least in the high 600s, signifying good credit, but Seed has enrolled consumers with lower credit scores in some circumstances.  CreditNav sorts applicants into three groups:  (1) those who qualify "as is;" (2) those who will qualify if their credit profile is "fixed" in certain ways; and (3) those who do not qualify.

51.     Defendants refer to consumers in the second group, "if fixed," as "contingent file" consumers.  At the Workshops, presenters often tell consumers that Seed can help fix any issues in their credit reports so that they will be able to proceed with Seed's funding.

52.     For example, at a July 19, 2019 Workshop, a Zurixx speaker encouraged consumers to sign up with CreditNav as follows:

> There's more money -- more deals than money.  So there's no risk in applying.  They'll also – if there's -- by the way, about 20 percent of you they'll say, hey, there's a mistake on your stuff; let's fix it or let me help you fix it.  Got it?  And that's what happened to me.  There was a mistake on mine and they fixed it for me.

53.     The CreditNav reports for contingent file consumers include an "If Fixed" section that describes how the consumers' credit reports will need to be improved in order to qualify for Seed's service.  Based on the CreditNav reports, Defendants work with consumers on the items identified in the "If Fixed" section of the reports, sometimes with the help of representatives of the Training Companies.  Defendants assist consumers in disputing and removing negative items, such as collections or tax liens, and paying down existing credit card

18

balances so that the consumers are not utilizing more than 45% of their existing credit card lines. The CreditNav report provides the precise dollar amount that consumers need to pay down to get below this threshold. In many cases, Seed itself interacts with the credit bureaus in order to improve consumers' credit profiles and submits the relevant documentation, such as the proof of a new credit card balance, directly to the bureaus.

54. During the process of fixing consumers' credit profiles, Seed regularly monitors consumers' credit profiles with the three credit bureaus through CreditNav. If the bureaus accept the information provided by Seed and update the consumer's credit record, Seed then begins the credit card application process on behalf of the customer. As explained below, however, any improvements in consumers' credit profiles are often temporary. By the conclusion of the application process, many consumers have suffered a significant decline in their credit scores.

55. At the time of enrollment, Seed's customers sign a "Business Consulting Services Agreement" (the "Consulting Agreement") that sets forth the terms of Seed's service. The Consulting Agreement defines Seed as the customer's "Consultant" and provides that "Consultant" will provide "consulting services and assistance related to establishing financial and credit accounts of [sic] behalf of Client and Client's business." The standard form Consulting Agreement does not mention the Training Companies, and they are not a party to the contract.

56. Under the Consulting Agreement, Seed's initial fee becomes due when Seed helps a consumer obtain credit cards with total available credit lines in excess of the "capital acquisition performance guarantee" ("CAPG") specified in the contract. The CAPG is typically $50,000, but in some cases the threshold is $25,000. Depending on the referral source, Seed's fee is between $3,000 and $4,000, regardless of the CAPG. Seed typically collects its fee by charging one of the new credit cards it obtains for its customers.

57.    An attachment to the Consulting Agreement discloses certain "highlights" of Seed's program, including that "[f]unding comes in the form of unsecured credit cards," "[t]he funding total will be achieved across multiple credit lines; 6-8 on average," the "[l]ines of credit will be 0% on average, for the first 12-18 months," and the "fully indexed interest rate, after the 0% period, will be between 8-15%, based on a student's exact credit profile."  In numerous instances, the highlights document is the first time it is revealed to consumers that Seed's "funding" comes in the form of multiple personal credit cards.  The document is at odds with the prior statements by the Training Companies' presenters and the language on the Seed Website that leads many consumers to understand that Seed would be providing a loan or line of credit to consumers, rather than merely submitting personal credit card applications.

### D.    Seed Causes Credit Card Applications Containing Inflated Income Figures to Be Submitted to Credit Issuers

58.    Within a few days of enrolling a new customer, a Seed representative typically calls the customer to discuss Seed's process.  This call is commonly the first contact between the customer and a Seed employee.  Up to this point, the customer typically engages only with representatives of the Training Companies about Seed's funding.

59.    Among other things, on the call, the Seed representative often discusses the income figure that Seed will list in the credit card applications it submits on behalf of its customers.  The applications do not mention the name of a business or any business purpose and therefore are treated by the issuers as applications for personal credit from consumers.  The issuers require such applications to include income figures in order to comply with legal requirements that they consider a consumer's ability to pay in connection with an application for personal credit.

60.     Specifically, Regulation Z, 12 C.F.R. Part 1026, implements the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et* seq.  Regulation Z requires credit issuers to consider a consumer's ability to pay before opening a new personal credit card account or increasing the credit limit on an already-existing account. 12 C.F.R. § 1026.51.  In making this determination, the issuer must consider "the consumer's ability to make the required minimum periodic payments under the terms of the account based on the consumer's income or assets and the consumer's current obligations." *Id.*

61.     Regulation Z further requires that card issuers maintain reasonable policies and procedures to consider the consumer's ability to pay, including "treating any income and assets to which the consumer has a reasonable expectation of access as the consumer's income or assets, or limiting consideration of the consumer's income or assets to the consumer's independent income and assets." *Id.*

62.     In its official commentary on Regulation Z, the Consumer Financial Protection Bureau states that when card issuers assess a consumer's income in making an ability to pay determination, the issuers "may consider any current or reasonably expected income" of the consumer.  12 C.F.R. § 1026.51(a)(1)(i), cmt. 4i, Supp. 1.  The commentary further explains that "[c]urrent or reasonably expected income includes, for example, current or expected salary, wages, bonus pay, tips, and commissions." *Id.* at 12 C.F.R. § 1026.51(a)(1)(i), cmt. 4ii, Supp. 1. As a result, some card issuers define income in their credit card applications to include amounts that consumers "reasonably expect" to earn.

63.     Other card issuers do not incorporate the concept of reasonably expected earnings into the definition or examples of income that appear in their credit card applications.  Nonetheless, Seed has obtained approvals for applications submitted to these issuers that incorporate projected income in the income figures listed in the applications.  Seed submits its credit card applications on a "stated

21

income" basis, without providing any support for the income figures.  The applications do not distinguish consumers' current incomes from any projected income.

64.     In numerous instances, Seed's employees have represented to Seed's customers that they can expect to earn substantial additional income through the programs provided by the Training Companies and that this additional, projected income should be included in the credit card applications.

65.     In many cases, Seed's representatives suggest to consumers that they should reasonably expect to earn an additional $100,000 or more of income in the next year.  As a result, the credit card applications that Seed prepares and submits on behalf of consumers routinely include income figures that exceed consumers' current annual income by $100,000 or more.

66.     Defendants do not have a reasonable basis to include, or to encourage consumers to include, substantial projected income amounts in the income figures listed in consumers' credit card applications.  To the contrary, most consumers referred to Seed do not earn substantial additional income by implementing the Training Companies' programs.  Indeed, the majority of Seed's customers do not even recoup the cost of the programs they purchased from the Training Companies.

67.     During their calls with consumers, Seed representatives often complete an "Ability to Repay/Income Calculation Worksheet" ("Income Worksheet").  Seed uses the Income Worksheets to record the income that Seed will list in the credit card applications it submits.

68.     Until at least February 2018, the Income Worksheets that Seed used with all of its customers listed three categories of consumers' purported income: "Current Income," "Anticipated/Projected Income," and "Income of others in which you have Reasonable Access."  The Income Worksheets define "Anticipated/Projected Income" as "[a]ny income that is reasonably expected to be earned over the next 12 months," including "income from a new business,

investments (properties or otherwise), new or additional employment, settlement, etc." Seed representatives total the amounts listed in each of these three income categories and list the cumulative figure as the consumer's income in the credit card applications they submit.

69. In a sample of 317 Income Worksheets completed by a Seed representative for Nudge customers, nearly half (140 out of the 317) of the worksheets indicated that the consumers had a current income of $50,000 or less. Conversely, nearly two-thirds (185 out of the 317) of the worksheets indicated that the consumers had an additional projected income of at least $100,000. Notably, 105 of these worksheets listed a projected income of exactly $100,000.

70. In February 2018, at Nudge's request, Seed modified the Income Worksheet it used with Nudge-referred customers to delete the reference to "Anticipated/Projected Income." Nonetheless, Seed continues to include figures that incorporate substantial projected income amounts in the credit card applications it submits on behalf of its customers. Seed does not have a reasonable basis to include substantial projected income in the applications it submits.

71. Seed's listing of inflated incomes in the credit card applications it submits on behalf of its customers interferes with credit issuers' capacity to accurately perform their consumer ability to pay analysis. Through this conduct, Seed causes issuers to extend credit to consumers under false pretenses and the conduct results in the company obtaining more credit for its customers than it would otherwise obtain absent this income inflation.

### E.   Seed Further Undermines the Credit Issuers' Underwriting Processes

72. After the initial customer call, Seed employees submit numerous credit card applications to third-party financial institutions seeking personal credit cards on behalf of its customers. Seed does not have a special relationship with

23

these financial institutions, and the credit cards it helps obtain are widely available to the general public.

73.     The credit card applications do not disclose that Seed, and not the consumer, prepared and submitted the applications.  Most of the applications are submitted online and Seed either creates, or directs its customers to create, a new email account that Seed includes in the applications.  Seed requires its customers to provide Seed access to this email account so that the company may monitor the status of the applications without the issuers becoming aware of Seed's involvement in the application process.

74.     A smaller number of credit card applications are submitted by phone. In an August 2017 email to a new customer, a Seed representative explained "Phone application – We will do your phone applications for you."  Seed directs its customers not to mention that they are working with a third party if a credit issuer contacts the customer about a credit card application.

75.     Seed submits the credit card applications in a manner that is designed to subvert the normal underwriting processes of the credit issuers.  Defendant Gantz is the individual primarily responsible for the development of Seed's credit card application process.

76.     In ordinary circumstances, consumers receive a "hard inquiry" on their credit reports every time they submit a credit card application.  Hard inquiries occur when a bank or other financial institution checks a consumer's credit in connection with making a lending decision.  "Soft inquiries" occur when a consumer checks his or her own credit or when credit card companies preapprove potential customers for credit card offers.  Unlike soft inquiries, hard inquiries appear on consumers' credit reports and impact their credit scores.

77.     Credit issuers' underwriting algorithms identify when consumers have a significant number of hard inquires on their credit reports within a short period of time.  When that occurs, the issuer may either deny the credit application or require

additional information from the consumer.  This is because numerous credit inquiries may signal that a consumer is experiencing financial distress or plans to overspend.

78.    Seed uses several tactics to undermine the issuers' underwriting processes.  For example, Seed has employed credit locks to block the credit issuers' ordinary credit pulls.  Credit locks restrict access to consumers' credit reports and are normally used by consumers to prevent identify theft, including the unauthorized opening of new accounts in their names.  Seed has used locks to try to force credit issuers to only check a consumer's credit with one credit bureau while the others are locked, thereby reducing the number of hard credit inquiries in connection with an application.  This tactic helps hide the fact that Seed applies for numerous credit cards for each consumer and allows the company to obtain additional credit for consumers.

79.    Seed also compiles information on how quickly credit issuers review their credit card applications and which of the three major credit bureaus (Equifax, Experian, or TransUnion) the issuers use to conduct hard inquiries.  Based on this information, Seed times and sequences the submission of its applications to minimize the number of credit inquiries associated with the consumer.  As Seed explains in one of its promotional materials:

> Seed Capital's understanding of each individual bank's underwriting is so in-depth, we even know what bank will pull which credit bureau based on a client's geography.  Unlike other companies that take a shotgun and hope approach, Seed Capital employs a highly surgical strategy to bank application submissions, ensuring that inquiries are evenly distributed over all three bureaus.  This makes certain that our clients will never be declined for "excessive inquiries" (which is the most common decline code and is nearly impossible to overturn) and it guarantees the highest degree of protection to our clients' credit.

80.    The overall effect of Seed's tactics is to reduce the number of credit inquiries on its customers' accounts and thereby prevent the credit bureaus and

credit issuers from obtaining an accurate understanding of consumers' credit profiles.  These actions undermine the issuers' credit underwriting decisions and cause them to offer credit to consumers that they would not otherwise offer and that exceeds the consumers' ability to pay.

### F.   Defendants Disclose Consumers' Private Financial Information to the Training Companies

81.    In the standard form Consulting Agreement, Defendants pledge that they will not "without the prior written consent" of their client "use or disclose to any third party any details regarding Client or Client's business" and that they will not use the client's confidential information "other than solely for the benefit of Client":

**11. CONFIDENTIAL INFORMATION.** Consultant acknowledges that it may receive statutorily confidential personal information during the performance of the Services. Consultant agrees that such information is of a highly confidential nature, and that, unless Consultant has the prior written approval of Client, both during and after the Term of this Agreement, Consultant shall not, without the prior written consent of Client: (i) use or disclose to any third party any details regarding Client or Client's business, including, without limitation any information regarding any of the Client's customer information, business plans, or price points (the "*Confidential Information*"), (ii) make copies of any Confidential Information or any content based on the concepts contained within the Confidential Information for personal use or for distribution, or (iii) use the Confidential Information other than solely for the benefit of Client; except that Consultant may disclose Confidential Information to persons who may be designated to work with Consultant in order to provide the Services.

82.    Despite these guarantees, Defendants routinely disclose consumers' private financial information to the Training Companies without consumers' knowledge or consent.

83.    For example, Defendants regularly notify the Training Companies when their customers have obtained new credit cards – and even the specific cards and amounts they have obtained – so that the companies may pitch additional coaching or training programs for which the consumers have not previously enrolled.  This information allows the Training Companies to target consumers who have available credit and to determine what level (*i.e.*, cost) of programs to pitch to those consumers based upon the amount of credit they have available.  In many instances, Defendants have purposefully concealed from consumers these communications with the Training Companies.

84.     In one typical exchange from May 2017, a Nudge employee emailed Defendant Gantz about a Coaching Program he intended to try to sell to a Seed customer.  In the email, the Nudge employee wrote "we are going to discuss an investment w/[consumer] this evening after hours[.]  [T]he most it would be is $29,690.  Could we get a breakdown of what cards to use before you guys leave this eve?  Please don't contact the client about the investment as we have not discussed it with them yet, thanks."  Gantz forwarded this email to a Seed employee and instructed her to provide the information.  The Seed representative, in turn, emailed the Nudge salesperson a breakdown of how to charge $29,700 on the consumer's cards:  "Chase AARP-15k;" "BOA-4.2k;" and "Discover-10.5k."

85.     Communications like this – in which Seed provides its customers' private credit information to the Training Companies to enable them to pitch additional trainings or coaching services to the customers – are commonplace for Defendants.

**G.     Seed's Funding Service Impairs Many Consumers' Credit Scores**

86.     Seed's funding service causes substantial and long-lasting declines in many of its customers' credit scores.  Defendants do not tell their customers about the likely credit score impact of its service, instead falsely suggesting that consumers' credit scores will significantly improve by the end of Seed's process.

87.     A consumer's credit utilization rate is the ratio of the consumer's revolving credit balances to his or her revolving credit limits.  Credit utilization rates are one of the primary factors in calculating credit scores.  In many instances, within mere days of Seed obtaining new credit cards for its customers, the Training Companies charge tens of thousands of dollars to the cards for the cost of their training programs.  This causes a substantial portion of the credit lines to be immediately exhausted by the cost of these trainings.  The substantial charges on these new credit cards cause the consumers' credit utilization rates to spike, leading their credit scores to significantly decline.

27

88.     The negative impact on Seed's customers' credit scores is exacerbated by the fact that most consumers who pay for the Training Companies' trainings and coaching services do not earn substantial additional income through the programs.  Even though Seed advises many of its customers to project $100,000 or more of additional income following the programs, the great majority of consumers do not even recoup what they paid to the Training Companies.  Accordingly, many of Seed's customers are unable to timely pay down the large credit card debts associated with the cost of the programs.

89.     For these reasons, many of Seed's customers experience substantial and sustained drops in their credit scores from the funding process.  In many cases, Seed's customers experience long-term credit score declines of more than 100 points that, in some cases, last years.

90.     Seed does not disclose to consumers before they enroll that many customers experience a significant, long-term negative impact on their credit scores as a result of the Seed process.  To the contrary, Seed's website falsely suggests that the only risk from Seed's funding process is "minimal" and short-term:

### Is there any risk or negative impact on me or my company?

There is no risk to you or your company other than the owner will receive inquiries on their personal credit report and those can have a minimal negative impact on the personal credit score for up to 6 months.

91.     After enrollment, Seed's representatives continue to downplay the negative credit score impacts from the Seed funding process.  For example, in a standard form email to Seed's customers on "Utilization's Effect on Credit," Seed's representatives indicate that in the "short term (0-6 months)," the

consumers will experience "temporary stress on your credit score."  However, in the "long term (1 year and beyond)":

> Once your overall balances are brought below the 50% utilization mark and you have now demonstrated a year of timely payments on all your new accounts; you can expect a PROFOUND increase to your credit score.  You have proven to the banks you are able to effectively manage a large amount of credit and are now a rock star in any lending institution's eyes!  At this stage, we routinely see our clients' credit scores increase dramatically; anywhere from 50-100 points compared to when they first entered our program.  As a credit rock star you can expect to be granted credit (of any kind) at the very best terms.

92.    Seed's statements misleadingly minimize the negative credit score impact from its services and convey the false impression that most consumers can expect to experience an improved credit score.  In actuality, many of Seed's customers experience substantial, lasting credit score declines as a function of loading up their credit cards with the cost of the trainings and their subsequent inability to timely pay down these debts.

93.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things: Defendants engaged in their unlawful acts and practices repeatedly over a period of at least six years; Defendants continued to enable the acts and practices of the Training Companies despite knowledge that many of them were the subject of law enforcement actions predicated on their illegal conduct; and Defendants continued to engage in the conduct at issue in this Complaint after the Defendants learned that the FTC was investigating them.

## VIOLATIONS OF THE FTC ACT

94.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

95.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

96.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

## COUNT I

### *Deceptive Income Claims*

97.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their credit card funding services, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who purchase and use the products and services of the Training Companies are likely to earn substantial income and may include such substantial projected income in applications submitted to credit issuers.

98.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 97, consumers who purchase and use the products and services of the Training Companies are not likely to earn substantial income and may not include such substantial projected income in applications submitted to credit issuers.

99.     Therefore, Defendants' representations as set forth in Paragraph 97 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

# COUNT II

## *Deceptive Coordination with Training Companies*

100.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of its credit card funding services, Defendants have represented, directly or indirectly, expressly or by implication, that Defendants (a) will act in the consumers' interest and for their benefit; and (b) will not disclose the consumers' personal information to third parties without the consumers' written authorization.

101.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 100, Defendants have (a) not acted in the interests or for the benefit of consumers, but instead have acted for the benefit of the Training Companies; and (b) disclosed consumers' personal financial information to the Training Companies without the consumers' prior authorization.

102.   Therefore, Defendants' representations as set forth in Paragraph 100 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

# COUNT III

## *Deceptive Credit Score Claims*

103.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their credit card funding services, Defendants have represented, directly or indirectly, expressly or by implication, that the only negative impact on consumers' credit scores related to Defendants' services will be minor and short-term.

104.   In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 103, consumers suffered substantial and long-term negative impacts related to Defendants' services.

105.   Therefore, Defendants' representations as set forth in Paragraph 103 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### *Unfair Credit Card Funding Practices*

106.   In numerous instances, Defendants have obtained credit cards for consumers for the purpose of enabling Training Companies engaged in deceptive practices to place charges on some or all of those cards, including by:

    a.   Obtaining credit cards for consumers that are used to pay for the Training Companies' fraudulent programs while allowing the Training Companies to market Defendants' services as a way for consumers to obtain capital to invest in their businesses;

    b.   Undermining the underwriting processes of credit issuers so that consumers obtain more credit than they would otherwise obtain, including by causing credit card applications to be submitted on behalf of consumers containing inflated income figures; or

    c.   Disclosing consumers' private financial information to the Training Companies without the consumers' knowledge or consent in order to enable the Training Companies to sell additional training and coaching services to consumers.

107.   Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

108.   Therefore, Defendants' acts or practices as set forth in Paragraph 106 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

109.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 61016108, in 1994.  The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.  16 C.F.R. Part 310.

110.   Some of the Training Companies, including Nudge and Zurixx, are "sellers" and "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2(aa), (cc), and (dd).

111.   The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer. 16 C.F.R. § 310.3(a)(2)(iii).

112.   The TSR also prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in acts or practices that violate Section 310.3(a).  16 C.F.R. § 310.3(b).

113.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### *Assisting and Facilitating Deceptive Telemarketing Acts*

114.   In numerous instances, Defendants provided substantial assistance or support to Training Companies when Defendants knew, or consciously avoided knowing, that the Training Companies were engaged in acts or practices that violate Sections 310.3(a)(2) of the TSR, as described in Paragraphs 1 through 93 above.

115.   Therefore, Defendants' acts or practices as set forth in Paragraph 114 violate the TSR, 16 C.F.R. § 310.3(b).

### VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

116.   CROA took effect on April 1, 1997, and has since that date remained in full force and effect.

117.   The purposes of CROA, according to Congress, are "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations."  15 U.S.C. § 1679(b).

118.   CROA defines a "credit repair organization" as "any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of – (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)."  15 U.S.C. § 1679a(3).

119.   Seed is a "credit repair organization."

120.   CROA prohibits all persons from "mak[ing] any statement, or counsel[ing] or advis[ing] any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity" to (A) any consumer reporting agency; or (B) any person who has extended credit to the consumer or to whom the consumer has applied or is applying for an extension of credit.  15 U.S.C. § 1679b(a)(1).

121.   Pursuant to Section 410(b)(1) of CROA, 15 U.S.C. § 1679h(b)(1), any violation of any requirement or prohibition of CROA constitutes an unfair or

deceptive act or practice in commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Pursuant to Section 410(b)(2) of CROA, 15 U.S.C. § 1679h(b)(2), all functions and powers of the FTC under the FTC Act are available to the FTC to enforce compliance with CROA in the same manner as if the violation had been a violation of any FTC trade regulation rule.

**COUNT VI**

***Causing False Statements to Credit Issuers***

122.   In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of services to consumers by a credit repair organization, as that term is defined in Section 403(3) of CROA, 15 U.S.C. § 1679a(3), Defendants have made, or counseled or advised consumers to make, statements which are untrue or misleading with respect to consumers' credit worthiness, credit standing, or credit capacity to persons who have extended credit to the consumers or to whom the consumers have applied or are applying for an extension of credit, including by causing credit applications to be submitted on behalf of consumers containing untrue or misleading information about consumers' incomes.

123.   Therefore, Defendants' acts or practices as set forth in Paragraph 122 violate Section 404(a)(1) of CROA, 15 U.S.C. § 1679b(a)(l).

**VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT OF 2016**

124.   In 2016, Congress passed the CRFA, P.L. 114-258, 15 U.S.C. § 45b.

125.   "CRFA" defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

126.   The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the

35

person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

127. Effective March 14, 2017, the CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. 15 U.S.C. § 45b(b)(l).

128. Effective March 14, 2017, the CRFA prohibits any person from offering a form contract containing a provision described as void in sub-section (b) of the CRFA. 15 U.S.C. § 45b(c).

129. Pursuant to the CRFA, a violation of sub-section (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d). Congress empowered the FTC to enforce the CRFA with respect to contracts in effect on or after December 14, 2017. 15 U.S.C. § 45b(e).

130. Defendants have offered "form contract[s]," as that term is defined in the CRFA. 15 U.S.C. § 45b(a)(3).

## COUNT VII

### *Unlawful Use of Non-Disparagement Provisions*

131. In numerous instances on or after December 14, 2017, Defendants have offered form contracts containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

132. Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

**CONSUMER INJURY**

133.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, CROA, and the CRFA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

134.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

135.    Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 410(b) of CROA, 15 U.S.C. § 1679h(b), and the CRFA, 15 U.S.C. § 45b(d), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, CROA, and the CRFA, including the rescission or reformation of contracts and the refund of money.

**PRAYER FOR RELIEF**

136.    Wherefore, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), Section 410(b) of CROA, 15 U.S.C. § 1679h(b), the CRFA, 15 U.S.C. § 45b(d), and the Court's own equitable powers, requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, CROA, and the CRFA by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, CROA, and the CRFA, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JAMES REILLY DOLAN
Acting General Counsel

Dated:  January 29, 2021

BRIAN N. LASKY
CHRISTOPHER Y. MILLER
Federal Trade Commission
One Bowling Green, Suite 318
New York, NY 10004
(212) 607-2829
(212) 607-2822 (Fax)
blasky@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION